## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Carol Haskell,

                     Plaintiff,

                                                 Civ. No. 12-1743 (RHK/LIB)
                                                 **MEMORANDUM OPINION**
                                                 **AND ORDER**

v.

CentraCare Health System – Long Prairie,

                     Defendant.

Tammy P. Friederichs, Stephen M. Thompson, Friederichs & Thompson, P.A., Bloomington, Minnesota, for Plaintiff.

John L. Greer, Hughes Mathews, P.A., St. Cloud, Minnesota, for Defendant.

## INTRODUCTION

From 1978 to 2012, Plaintiff Carol Haskell worked as an "Activities Aide" for Defendant CentraCare Health System – Long Prairie ("CCHS"), a hospital and nursing home in Long Prairie, Minnesota. She contends in this action that after taking a three-month leave to treat back problems, CCHS refused to return her to her prior position, in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* CCHS now moves for summary judgment. For the reasons that follow, its Motion will be granted in part and denied in part.

**BACKGROUND**

Most of the relevant facts are undisputed; where disputed, they are recited below in the light most favorable to Haskell.

CCHS is a 25-bed "critical access hospital" and adjacent 70-bed nursing home, serving the Todd County, Minnesota area. The nursing home provides 24-hour, skilled nursing services to geriatric patients and those needing rehabilitation. Included within the nursing home is the "Rose Lane" unit, which provides care for residents with memory and behavioral problems. Rose Lane includes an Activities Department that plans social activities for residents, as well as exercise classes several days per week. The Activities Department employs two or three Activities Aides, who (among other things) prepare social programs, decorate for and clean up after events, and prepare paperwork charting how and when residents are involved in the department's activities.

Haskell began working for CCHS as an Activities Aide in 1978. Although she was initially employed on a full-time (40 hours per week) basis, she eventually transitioned to a part-time role, working approximately 24 hours per week on a 6:00 am to 2:30 pm shift. In addition to performing the Activities Aide duties described above, Haskell also ran the Rose Lane exercise program, for which she was paid $1 per hour over and above her regular hourly rate.[1] In that role, she spent between 60 and 90 minutes, three days per week assisting residents with basic strength-training exercises.

Throughout her employment Haskell received positive performance evaluations. Her 2009 review – prepared by her supervisor, Therapeutic Recreation Manager Sharon

---

[1] Haskell's regular hourly rate was $15.09. (Friederichs Aff. Ex. III.)

Reuter – indicated that she met or exceeded CCHS's expectations for all of her various job duties. This included planning social activities, preparing social functions and cleaning up afterwards, and preparing charting and paperwork documenting resident involvement in activities. Her 2010 review was similar, providing that she exceeded expectations in the categories working with residents, preparing charting/paperwork, and decorating for (and cleaning up after) social activities, and met expectations in her remaining job functions.[2]

In late 2008 or early 2009, Haskell's then-supervisor, Linda Mentele, asked her to undertake the Activities Department's "MDS" responsibilities. The MDS is part of the "federally mandated process for clinical assessment of all residents in Medicare and Medicaid certified nursing homes." http://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/Minimum-Data-Set-3-0-Public-Reports/index.html (last visited June 30, 2013).[3] Its purpose is to provide a comprehensive assessment of each resident's functional capabilities and help staff identify health problems. It involves interviewing each new resident upon admission to understand his or her needs and abilities and devising a care plan individually tailored to meet those needs and abilities. Updates, which also involve interviewing residents, must be performed quarterly, annually, and any time a resident has significant changes in functionality, in order to

---

[2] For reasons undisclosed in the record, Haskell did not receive a 2011 performance evaluation.

[3] Although Haskell understood the term "MDS" to stand for "Minnesota Data Statistics," the acronym was created by the federal Centers for Medicare & Medicaid Services (CMS) and actually stands for "Minimum Data Set." http://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/Minimum-Data-Set-3-0-Public-Reports/index.html (last visited June 30, 2013).

ensure that the resident's care plan adequately accounts for his or her present capabilities and needs. Each of these assessments is required to be "completed within specific guidelines and time frames," and the information collected "is transmitted electronically by nursing homes to the national MDS database at CMS." Id.

A significant portion of Haskell's daily responsibilities involved MDS duties. While the exact amount of time varied based on the volume of residents, the number of new admissions, and the like, Haskell devoted approximately 50% to 60% of her working hours to MDS duties, including the necessary computer data entry.[4] Haskell enjoyed this work, including both the interviews and the data-entry component.

On December 8, 2011, Haskell submitted to CCHS a request for leave under the FMLA, in connection with a bulging disc in her back. The plan was for her to take 12 weeks off of work, during which she would receive spinal injections in an attempt to alleviate her symptoms. CCHS approved the request, with Haskell's expected return-to-work date set for March 8, 2012.

During Haskell's absence, Reuter assumed the MDS data-entry duties; the record is somewhat unclear whether it was Reuter or the remaining Activities Aides that undertook the assessment portion of the MDS. In any event, Reuter found it "helpful" to perform the data-entry function herself, as it allowed her to become more familiar with

---

[4] CCHS disputes this calculation as Haskell's "self-assessment of her time" (Reply Mem. at 2), but her 2010 performance evaluation, which was prepared by *Reuter*, confirms that Haskell devoted 60% of her time to MDS duties. (Haskell Dep. at 46-47 & Ex. 2.) Moreover, her 2009 evaluation initially indicated 15% for MDS duties, but Reuter crossed that out and wrote 50%, a number Haskell testified was calculated "mutually" with Reuter. (Id. at 38-39.) CCHS also contends that Haskell would have devoted significantly less time to MDS duties but for "her inefficiency at typing" (Reply Mem. at 2), yet no such "inefficiency" was noted on the performance evaluations contained in the record.

the residents and their abilities. She also felt that she was more efficient performing the data entry because she was a better typist than Haskell. She decided, therefore, to continue performing the MDS duties upon Haskell's return from leave, with the exception of the quarterly assessments. This change would free Haskell to spend more time assisting residents "on the floor," such as helping with resident feedings and other duties Reuter could not perform because she is not a certified nursing assistant (CNA) like Haskell.[5]

For this same reason, Reuter also decided to change Haskell's working hours to 7:30 am to 4:00 pm (from 6:00 am to 2:30 pm), due to a greater need to provide residents assistance in the afternoon – assistance that only a CNA could provide. Furthermore, Reuter and her supervisor, Roxanne Ostendorf (the Director of Nursing), had concerns whether Haskell would be able to perform the exercise program in light of her back problems. Because a different department oversaw the program in Haskell's absence and it had been "going well" (Haskell Dep. Ex. 11), it was also decided that Haskell would no longer lead the program when she returned.

---

[5] CCHS contends that the *only* portion of the MDS duties removed from Haskell was data entry. (Def. Mem. at 15.) The record belies this contention – Reuter testified in her deposition that she removed not only data-entry duties, but also the responsibility for performing so-called "comprehensive" resident assessments, including initial assessments (at admission), annual assessments, and assessments when residents had undergone significant changes in functional capacity. (Reuter Dep. at 59-60.) CCHS also asserts that Haskell *acknowledged* in her deposition that she was losing only the data-entry portion of the MDS duties (Reply Mem. at 5), but she corrected that testimony and averred she had been told *all* of the MDS functions were being reassigned. (See Haskell Dep. at 124 ("Q: Okay. They had clarified . . . that the MDS tasks that you would no longer be doing would simply be the data entry, didn't they? A: *No, I would not be doing the reviews or anything.*") (emphasis added).)

On February 23, 2012, Haskell called Reuter to advise that she had been cleared by her doctor to return to work. Reuter told her that they "needed to talk" about the changes in her position, and they scheduled a conference call for later that week. The conference call took place on February 28, 2012, with Haskell, Reuter, Ostendorf, and Joyce Chan, CCHS's Director of Human Resources, participating.[6] Reuter informed Haskell that her job duties would be changing, although she would retain the same title and pay. She also told Haskell that her hours were changing to 7:30 am to 4:00 pm, subject to possible further change based upon the "needs of the department." Reuter explained that she (Reuter) would be taking over the MDS duties and the "restorative nursing" department would be taking over the exercise program. Ostendorf added that she did not believe Haskell could perform the exercise program due to her back problems. When Haskell said she had received a medical certification from her doctor, she was simply told to bring the certification when she returned to work.

Haskell was taken aback by these changes, as they eliminated a significant portion of her previous job duties. When she asked precisely what she would be doing upon her return, she was informed that it would be "ever-changing with the needs of the residents" but would involve more "floor" work, meaning traditional CNA duties such as ambulating residents and assisting with feedings, some of which Haskell had not performed in many years. Haskell then asked for a job description providing specifics about her duties upon her return.

---

[6] Reuter took handwritten notes of the call, typed them, and shredded the handwritten ones. (Reuter Dep. at 79-80.) Ostendorf and Chan reviewed and initialed the typewritten notes, which are in the record as Exhibit 11 to Haskell's deposition.

On February 29, 2012, Chan sent a handwritten letter to Haskell enclosing two "functionality sheets." These were generic descriptions of the job duties of an "activities assistant/CNA" and an "activities assistant/CNA/MDS," respectively. Haskell did not believe these functionality sheets accurately reflected the job duties described in the February 23 conference call and did not inform her of the specific duties she would be performing (or the amount of time to be devoted to her various tasks). Moreover, the second functionality sheet referenced MDS duties, and Haskell understood that she would no longer be performing those duties.

Accordingly, on March 5, 2012, she sent CCHS a letter "express[ing] concern about not receiving an accurate job description." (Haskell Dep. Ex. 8.) She noted that in the conference call she has been told she "would no longer be involved in the MDS," but the second functionality sheet "continues to list a job functionality within the MDS." She also questioned her removal from the exercise program, pointing out that she received additional pay for that role that she would no longer receive. She wrote that the situation had "left [her] feeling emotionally distraught and in fear of returning to [her] job."

On March 6, 2012, Reuter, Ostendorf, and Chan telephoned Haskell to discuss her letter. In their conversation, it was explained that Haskell could continue to lead the exercise program, but only once she provided CCHS with medical certification and only after taking additional classes to "get up to speed" on changes that had been made in her absence. Reuter reiterated, however, that Haskell would not perform MDS duties.

Haskell was surprised by this phone call, as it came "out of the blue" while she had family members at her home, including her grandchildren. She felt unprepared to

take the call and "very intimidated, very harassed" with three supervisors on the line. (Haskell Dep. at 119-21.) She stated that in light of this fact and the changes to her job, CCHS had created a hostile environment and she felt she could not return to work. Chan asked Haskell if that meant she was resigning, and she answered in the affirmative. She never returned to CCHS.

In July 2012, Haskell commenced this action, asserting that CCHS violated the FMLA by failing to reinstate her to the position she held before taking leave.[7] With discovery complete, CCHS now moves for summary judgment. The Motion has been fully briefed and is ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*);[8] Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably

---

[7] The FMLA contains no exhaustion requirement. See, e.g., Sanvee v. Hennepin Cnty. Human Servs., Civ. No. 10-527, 2012 WL 4128388, at *16 (D. Minn. Aug. 13, 2012) (Report & Recommendation of Mayeron, M.J.), adopted, 2012 WL 4120507 (D. Minn. Sept. 19, 2012) (Kyle, J.). Hence, Haskell was not required to file a charge with the EEOC before commencing this action.

[8] Several Eighth Circuit cases cited herein have a "red flag" on Westlaw as a result of Torgerson, which abrogated a litany of decisions suggesting summary judgment should be sparingly granted in discrimination cases. Because this Court has cited these cases for different legal principles that remain good law, it has not indicated such abrogation.

drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

**I.    The FMLA generally**

Congress enacted the FMLA to "balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1). The statute entitles employees to a total of 12 weeks' leave from work during any 12-month period for medical reasons or to care for close family members with serious health conditions. § 2612(a)(1).[9] The statute renders it unlawful for an employer to "interfere with, restrain, or deny the exercise of . . . any right provided" thereunder or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by its terms. § 2615(a)(1)-(2). Hence, two types of claims exist under the FMLA: "interference" claims, in which the employee "alleges that an employer denied or interfered with his substantive rights under the FMLA," and "retaliation" claims, in which the employee "alleges that the employer discriminated against him for exercising his FMLA rights." Stallings v. Hussmann Corp.,

---

[9] The statute applies only if (1) the plaintiff has been employed "for at least 1,250 hours of service with [her] employer during the previous 12-month period" and (2) the employer has at least 50 employees within 75 miles of the plaintiff's worksite. 29 U.S.C. § 2611(2)(A)-(B). There is no dispute these conditions have been met here.

447 F.3d 1041, 1050 (8th Cir. 2006); accord, e.g., Phillips v. Mathews, 547 F.3d 905, 909 (8th Cir. 2008).[10]

Here, the Complaint does not clearly indicate whether Haskell asserts an interference claim or a retaliation claim, but she has clarified in her brief that she asserts both. In the Court's view, only the former claim passes muster.

## II. Interference

The FMLA provides that upon return from leave, an employee must be "restored . . . to the position of employment held by the employee when the leave commenced" or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). Notably, unlike most employment claims, the employer's intent is irrelevant to an interference claim. E.g., Ballato v. Comcast Corp., 676 F.3d 768, 772 (8th Cir. 2012).[11] "[An] interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA." Stallings, 447 F.3d at 1051.

---

[10] The Court labels Haskell's claims as "interference" and "retaliation" for the sake of clarity, as both parties have used those labels. The Court notes, however, that these labels are predicated on now-outdated case law. The Eighth Circuit recently clarified that three types of claims exist under the FMLA: entitlement, retaliation, and discrimination. See Bosley v. Cargill Meat Solutions Corp., 705 F.3d 777, 780 (8th Cir. 2013). While earlier cases had "sometimes describe[d] claims brought under 29 U.S.C. § 2615(a)(1) as 'interference' claims, that terminology may not illuminate, because *all* prohibited acts under § 2615(a) appear under the heading '*Interference* with rights.'" Id. (emphases in original). Such a cause of action is more aptly labeled an "entitlement claim," because the "employee claims the denial of a benefit to which he is entitled under the statute." Id. Moreover, the type of "retaliation" alleged here fits best as a "discrimination" claim, because CCHS did not "prevent [Haskell] from receiving FMLA benefits," but rather allegedly acted against her "after [she] exercised [those] rights." Id. Despite the different labels, the elements of these claims have not changed.

[11] Also notable is that this type of claim is not analyzed using the traditional McDonnell Douglas burden-shifting framework. Stallings, 447 F.3d at 1050 n.3.

Haskell asserts that CCHS "interfered" with her FMLA rights by not restoring her to the same job she had when she took leave. CCHS does not dispute that it changed her job duties while she was on leave and, hence, did not offer her the *same* position. Rather, it argues she was offered an "equivalent" one. (Def. Mem. at 23-30.) To support their arguments, the parties rely upon the same Department of Labor regulation, which provides that an equivalent position "is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a). Hence, CCHS cannot avoid liability simply because Haskell held the title "Activities Aide" before taking leave and would have held the same title upon her return. See Cooper v. Olin Corp., Winchester Div., 246 F.3d 1083, 1091 (8th Cir. 2001) ("[T]he restoration of salary, title, and benefits does not necessarily constitute restoration to the same position within the meaning of section 2614(a)(1)(A) when the job duties and essential functions of the newly assigned position are materially different from those of the employee's pre-leave position."); Womack v. RCM Techs. (USA), Inc., Civ. No. 07-2111, 2008 WL 5382318, at *4 (D. Minn. Dec. 23, 2008) (Frank, J.) ("[I]t is possible to state a claim of interference under the FMLA where an employee's job responsibilities are altered upon return from leave in ways other than the most tangible, such as job title, salary and benefits."). Rather, the question is whether the old job and the new job, despite having the same titles, involved "materially different" duties. Cooper, 246 F.3d at 1091; see also 29 C.F.R. § 825.215(f) ("The requirement that

an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis, intangible, or unmeasurable aspects of the job.").

Haskell contends that the changes to her job duties were material and, hence, she was not offered an equivalent position. CCHS counters that the job changes were *de minimis*. Although a close call, in the Court's view the record creates a genuine issue whether the changes were material and, accordingly, whether CCHS offered Haskell an equivalent position.

First, it is undisputed that CCHS changed Haskell's hours from 6:00-2:30 to 7:30-4:00. Yet, an employee "is ordinarily entitled to return to the same shift or the same or an equivalent work schedule." 29 C.F.R. § 825.215(e)(2). While Haskell's new schedule would encompass the same *number* of hours, the Court cannot conclude, as a matter of law, that a 90-minute *shift* in those hours was necessarily *de minimis*. See Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 766 (5th Cir. 2001) ("The Department of Labor Guidelines do not treat different shifts involving the same duties and pay as equivalent jobs.").

McFadden v. Seagoville State Bank, No. 3:08-CV-0467, 2009 WL 37596 (N.D. Tex. Jan. 6, 2009), is instructive on this point. There, the plaintiff had worked 7:00 am to 3:30 pm Monday through Thursday, and 8:00 am to 6:00 pm on Friday, before taking FMLA leave. When she returned, she was offered a position working 8:00 am to 4:00 pm Monday through Friday. McFadden noted that while not "as significant as a 'shift change' from a day shift to a night shift," the change in the plaintiff's hours was one

factor creating a genuine issue whether the plaintiff was offered an equivalent position. Id. at *9-10. That is equally true here.[12]

Second, and more importantly, a jury could conclude that CCHS changed Haskell's job duties in a material way when it removed the MDS work. As noted above, before taking leave Haskell spent a substantial portion of her day performing MDS duties, including data entry and patient interviews for quarterly, annual, and other assessments. Upon her return, however, she would only be doing quarterly assessments, which comprised but a small portion of the MDS work. (Reuter Dep. at 18.) Moreover, Reuter expected Haskell to be "on the floor," which she did not clearly explain but which appeared to involve some component of CNA duties (see Haskell Dep. Ex. 11), including tasks that Haskell testified she had not performed in approximately 30 years (id. at 25).[13] Removing duties comprising a substantial component of Haskell's job (the MDS) and replacing them with different duties requiring different skills (CNA) could reasonably be construed as a material change. See 29 C.F.R. § 825.215(a) (new position must "involve

---

[12] CCHS points out that Haskell's hours had changed over the course of her employment (Def. Mem. at 27), but there is no dispute that her regular hours were 6:00-2:30 for several years prior to taking leave. (See Haskell Dep. at 17-18.)

[13] CCHS finds "bizarre" Haskell's claim that she did not perform CNA duties, as she testified in her deposition that she "assisted residents with feeding, which required CNA certification." (Reply Mem. at 2.) But Haskell did not perform *other* CNA duties, such as assisting with toileting or bathing (so-called "resident cares"), which the record suggests she would have been required to perform upon her return. (See Haskell Dep. at 85-87; id. Ex. 7 (functionality sheets indicating that "resident cares" would be part of her job).)

the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority").[14]

Cooper supports the Court's conclusion. There, the plaintiff had been employed as a locomotive operator before taking FMLA leave, but was assigned office work upon her return, despite retaining the same title, pay, and benefits. The district court dismissed the plaintiff's FMLA interference claim, concluding that she had failed to create a genuine issue whether she had been returned to the same or equivalent position. The Eighth Circuit disagreed and reversed, based on the changes to the plaintiff's job duties. 246 F.3d at 1090-91. The Court perceives no principled reason to deviate from Cooper here. See also, e.g., McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1003-04 (8th Cir. 2005) (Lay, J., dissenting); Callaway v. Acad. of Flint Charter Sch., 904 F. Supp. 2d 657, 667 (E.D. Mich. 2012); McFadden, 2009 WL 37596, at *8-10; Womack, 2008 WL 5382318, at *6.

At bottom, the test for equivalence is "strict," Breneisen v. Motorola, Inc., 512 F.3d 972, 977 (7th Cir. 2008), and generally presents a fact question for the jury, e.g., Reid-Falcone v. Luzerne Cnty. Cmty. Coll., No. 3:CV-02-1818, 2005 WL 1527792, at *7 (M.D. Pa. June 28, 2005); Parker v. Hanhemann Univ. Hosp., 234 F. Supp. 2d 478, 489 (D.N.J. 2002). Haskell has proffered sufficient evidence here to create a jury question whether CCHS offered her an equivalent position.

---

[14] While CCHS also removed Haskell from the exercise program, there does not appear to be any dispute she was told she could resume those duties once she had completed additional training. It is unclear, therefore, whether this would constitute a material change to Haskell's job. The Court need not resolve that issue, however, because it finds summary judgment inappropriate simply from the change in hours and the removal of MDS duties.

This does not end the inquiry, however. While proof of intent is not required, the FMLA "does not impose strict liability on employers for interference claims." Ballato, 676 F.3d at 772. Accordingly, even where (as here) an employee makes a threshold showing of interference, her employer will not be liable if it can "prove it would have made the same decision had the employee not exercised [her] FMLA rights." Blakley v. Schlumberger Tech. Corp., 648 F.3d 921, 934 (8th Cir. 2011). The burden rests with "*the employer* to prove the reason for [its action] was unrelated to the FMLA." Phillips, 547 F.3d at 911 (emphasis added). CCHS attempts to invoke this defense here, arguing that it would have made the changes to Haskell's position regardless of her FMLA leave, but the evidence is insufficient to grant CCHS summary judgment on this basis.[15]

CCHS notes that it had undertaken discussions to change Haskell's hours before she took FMLA leave, but the record indicates that no final decision was made until after the leave began. Nothing suggests that the changes in hours or Haskell's job responsibilities had been communicated, or even hinted, to her before taking leave. See Reid-Falcone, 2005 WL 1527792, at *6 (denying summary judgment on "same decision" defense where evidence indicated job functions were not changed until after leave began). Furthermore, at least one document in the record (CCHS's response to Haskell's application for unemployment benefits) indicates that Reuter decided to take over the MDS duties only because Haskell was on FMLA leave and she (Reuter) "felt the process was working better." (See Friederichs Aff. Ex. III ("[Reuter] took over the[] [MDS]

---

[15] CCHS first raised this argument in its Reply brief. The Court normally does not entertain such arguments, see D. Minn. LR 7.1(c)(3)(B), but it will address the argument here.

tasks while Carol was gone [and] felt the process was working better than before . . . . *So, the decision was made* that Carol would do more hands on activities . . . instead of [the MDS].") (emphasis added).) Given these facts, the Court cannot conclude as a matter of law that CCHS would have changed Haskell's job regardless of her FMLA leave.[16]

## III. Retaliation

Haskell's remaining claim alleges that CCHS retaliated against her for exercising her FMLA rights (by taking leave). An employer may not consider "an employee's use of FMLA leave as a negative factor in an employment action." Hite v. Vermeer Mfg. Co., 446 F.3d 858, 865 (8th Cir. 2006). "Basing an adverse employment action on an employee's use of leave, or in other words, retaliation for exercise of [FMLA] rights, is therefore actionable." Id. (quoting Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002)). In the absence of "direct evidence" of retaliation, which Haskell does not allege, this claim is analyzed under the familiar McDonnell Douglas burden-shifting framework. E.g., Blakley, 648 F.3d at 934. Haskell must first establish a *prima facie* case of retaliation, which requires her to proffer sufficient evidence to show (1) she engaged in activity protected under the FMLA, (2) she suffered a materially adverse

---

[16] CCHS also argues that it escapes liability for "interference" because Haskell resigned from her position. (Def. Mem. at 20-23.) This argument is a non-starter, because Haskell asserts she resigned *because CCHS did not restore her to the same (or an equivalent) job*. See Watkins v. J & S Oil Co., 164 F.3d 55, 59 (1st Cir. 1998) (affirming plaintiff's verdict on FMLA claim despite him having informed employer, "I think we're going to part company," as statement simply "recogni[zed] that J & S refused to offer him reinstatement to an equivalent position"); Hood v. Transitional Hosps. Corp. of Nev., Inc., No. 2:06-cv-1450, 2008 WL 304732, at *4 (D. Nev. Jan. 23, 2008) (rejecting argument that defendant avoided FMLA liability because plaintiff resigned in face of unequal position; "The Court does not interpret the FMLA as requiring an employee to make a futile attempt to return after an employer unequivocally communicates that the [new] position is one that violates the employee's rights under the FMLA.").

employment action, and (3) a causal connection exists between her conduct and the adverse employment action. E.g., Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1007 (8th Cir. 2012). The Court concludes that Haskell has failed on the second prong of her *prima facie* case.

Although the Court has determined that the changes to Haskell's job were more than *de minimis*, this does not mean the changes necessarily amounted to a materially *adverse* employment action. To be materially adverse, the alleged retaliation "must produce some injury or harm." Littleton v. Pilot Travel Ctrs., LLC, 568 F.3d 641, 644 (8th Cir. 2009). While actions short of demotion, reduction in pay, or termination may constitute materially adverse employment actions, "not everything that makes an employee unhappy is . . . actionable." Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997).

The Eighth Circuit has repeatedly recognized, for example, that a transfer to another city with the same salary and title does not constitute an actionable adverse employment action. See, e.g., Pettus v. Harvey, 494 F. App'x 698, 699 (8th Cir. 2012) (*per curiam*); Montandon, 116 F.3d at 359. More pertinent, "[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not [suffice]." Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 926 (8th Cir. 2007); accord, e.g., Chappell v. Bilco Co., 675 F.3d 1110, 1117 (8th Cir. 2012) (noting that more than a change in working conditions is required); Buboltz v. Residential Advantages, Inc., 523 F.3d 864, 869 (8th Cir. 2008) ("[A]n alteration of job responsibilities . . . does not constitute an adverse action."); Higgins v. Gonzales, 481

F.3d 578, 585 (8th Cir. 2007) ("[A] job reassignment involving no corresponding reduction in salary, benefits, or prestige is insufficient."); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (job reassignment involving "nothing more disruptive than a mere inconvenience or an alteration of job responsibilities," without any "diminution in . . . title, salary, or benefits," was insufficient). In the Court's view, this is all Haskell has offered here.

To be sure, Haskell *does* allege that CCHS removed her from the exercise program, for which she was paid an additional $1 per hour. But she testified that the exercise program lasted an hour to an hour and a half, three times per week, meaning that losing this function diminished her weekly pay by, at most, $4.50. The Court does not believe this is sufficient to constitute a materially adverse employment action, particularly in light of the fact that Haskell was told she could resume the exercise program once she completed additional training – that is, the small diminution in pay was not necessarily permanent. See Baucom v. Holiday Cos., 428 F.3d 764, 767-68 (8th Cir. 2005) ("slight decrease" in hours worked by plaintiff, who was paid on an hourly basis, and concomitant lost opportunity for overtime did not constitute materially adverse employment action); Brown v. Gap, Inc., No. 06-0380-CV-W-FJG, 2007 WL 4556940, at *5 (W.D. Mo. Dec. 21, 2007) (same).

Perhaps recognizing that the change in hours and job duties alone would not suffice, Haskell argues that CCHS constructively discharged her. (Mem. in Opp'n at 25-28.) Constructive discharge constitutes a materially adverse employment action. E.g.,

Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1083 (8th Cir. 2010). "The bar to relief, however, is high." Id. Haskell cannot surmount that bar here.

"To prove constructive discharge, a plaintiff must show (1) a reasonable person in [her] situation would find the working conditions intolerable, and (2) the employer intended to force [her] to quit." Quinn v. St. Louis Cnty., 653 F.3d 745, 752 (8th Cir. 2011) (quoting Fercello, 612 F.3d at 1083). While Haskell told CCHS that *she* felt the changes to her job created a hostile environment to which she could not return, "[t]he intolerability of working conditions is judged by an *objective* standard, not the employee's subjective feelings." Tatom v. Ga.-Pac. Corp., 228 F.3d 926, 932 (8th Cir. 2000) (emphasis added). "[T]he question is whether working conditions were rendered so objectionable that a reasonable person would have deemed resignation the only plausible alternative." Id. In the Court's view, the job changes in question here simply do not meet this demanding standard. See id. (collecting cases in which the Eighth Circuit "has held that such things as loss of supervisory responsibilities, a feeling of being unfairly criticized, *dissatisfaction with work assignments*, and loss of pay are insufficient to constitute a constructive discharge") (emphasis added).[17]

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that CCHS's Motion for Summary Judgment (Doc. No. 14) is **GRANTED**

---

[17] CCHS argues that in the absence of constructive discharge, Haskell's damages are limited and she cannot recover future lost wages. In the Court's view, arguments concerning damages are best left for trial. That said, because only the "interference" claim has survived CCHS's Motion, a significant award of damages at trial (assuming *arguendo* Haskell is successful) appears unlikely based on the Court's review of the evidence in the record.

**IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to Haskell's FMLA "retaliation" claim, and that claim is **DISMISSED WITH PREJUDICE**. The Motion is **DENIED** as to Haskell's FMLA "interference" claim.

Date: July 2, 2013                         s/Richard H. Kyle
                                           RICHARD H. KYLE
                                           United States District Judge